## J. W. JORDAN, *et al.*, v. HENRY J. GOLDMAN.

### (*Opinion filed Sept. 16, 1891.*)

1. CHEROKEE NATION.— *Title to Cherokee Outlet.*—The Cherokee Nation holds the lands in the Cherokee Outlet by the same *title* as they hold the lands *ceded* and *granted* to them for a permanent home, that is, the treaties of 1828, 1833 and 1835, and the patent of 1838; but their *estate* in the lands in the Cherokee Outlet is a base, qualified or determinable fee, with the qualification annexed to the *use.*

2. CHEROKEE OUTLET.—*By what Title Held.*—The qualification annexed to a base, qualified or determinable fee may be either one of two kinds: It may be a qualification which is attached to the use of the land itself, so that the *estate* is held to be granted for that use and purpose only, and on the cessation of the use the estate expires; or it may be one which is concerned with the happening of a more strictly collateral event, leaving the use of the estate free for any purpose, but limiting its existence only by the event contemplated. The *estate* of the Cherokee Nation in the Cherokee Outlet is of the first class.

3. SAME—*Lands, How Granted.*—The lands in the Cherokee Outlet were ceded and granted to the Cherokee Nation *as an outlet,* and for the purposes of an *outlet* only, and not for residence and cultivation; and, in such case, the law annexes the qualification, or condition, that the estate shall continue in the Cherokee Nation only so long as the lands are *used as an outlet,* and no longer; and when the Cherokee Nation ceases to use the land *as an outlet,* such *cesser* of the use determines their estate, and the lands *revert* to the United States.

4. SAME.—*Wrongful Use of Lands.*—The lands having been ceded and granted *as an outlet,* they cannot be lawfully used for any other purpose, either by the Cherokee Nation or persons claiming by license or lease under the Cherokee Nation; and the subjection of the lands to any other use is wrongful, and a breach of the qualification, or condition, annexed to the estate, and works a termination of the estate, and the lands *revert* to the United States.

5. CHEROKEE NATION.—*Right to Use Lands.*—The Cherokee Nation has no right to use the lands for the purpose of operating a stone quarry therein, and selling and shipping the rock, and could give the the complainants, by license, no greater right than the Cherokee Nation itself has; and the operating of the stone quarry by the complainants is wrongful, and a court of equity will not protect them by injunction in such wrongful act.

5. LANDS NOT USED —*Cesser of Estate.*—If the Cherokee Nation has ceased to use the lands *as an outlet*, such *cesser* has terminated their estate, and the lands have *reverted* to the United States. But whether there has been such *cesser* is a political rather than a judicial question, and should be settled by congress and the chief executive of the nation.

*In the District Court of Logan County, Oklahoma Territory, sitting with the powers and jurisdiction of the District and Circuit Courts of the United States.*

On March 2, 1891, complainants, claiming to be Cherokee citizens, and as such entitled to farm lands and operate a stone quarry on the Cherokee Outlet, filed their bill for an injunction against the defendant, who as an army officer was, under the proclamation of the president, dated February 17, 1890, and certain orders of the war department, ejecting cattle and persons from the Cherokee Outlet, and was about to eject therefrom complainants, with their property, and close up the quarry.

*James Brazzolara*, for plaintiff.
No brief on file.

*Horace Speed*, for defendant.

The following brief and argument was filed by counsel for defendant :

The bill will not lie. These ejectments the president considers necessary in the administration of his duties as the chief executive of this nation, and the defendant is acting directly under his orders in making them. They are executive and political acts of the executive department ; and it is established· doctrine that the orders of the president or the orders of the secretary of war in matters executive and political, cannot be questioned by the courts. (The confiscation cases, 20 Wall. 109; *Wilcox v. Jackson*, 13 Pet. 513;·

*State of Mississippi v. Johnson*, 4 Wall. 499 ; *Cherokee Nation v. Georgia*, 5 Pet. 1–20.)

In the case of the *State of Mississippi v. Johnson, supra*, the supreme court held, that in the exercise of his duties executive and political, the president is not subject to a writ of mandamus.

In the case of *Wilcox v. Jackson, supra*, the same court held that the acts of the secretary of war are to be deemed the acts of the president.

In the case of the *Cherokee Nation v. State of Georgia*, a bill prayed an injunction against the governor of Georgia and others, who threatened to execute certain laws of that state, which the bill charged were in plain violation of a treaty of the United States with the Cherokee Indians.

The supreme court of the United States, considering the case, said that the court was to do more than to decide on the Indian title ; it was required to control the legislature of Georgia, and to restrain the exercise of its political power. The court said the propriety of such an interposition may well be doubted ; it savored to much of the exercise of political power to be within the province of the judicial department (p. 20), and Justice Johnson, at page 30, made these pertinent observations :

"What these people have a right to claim of the executive power is one thing ; whether we are to be the instruments to compel another branch of the government to make good the stipulations of treaties, is a very different question.

"Courts of justice are properly excluded from all consideration of policy, and therefore are very unfit instruments to control the action of that branch of the government which may often be compelled by the highest considerations of public policy, to withhold even the exercise of a positive duty.

"There is a great deal of good sense laid down in the Nabob of Arcot's case, to-wit : That as between sovereigns, breaches of treaty are not breaches of contract cognizable in a court of justice, independent of the general principle, that for their political acts, states are not amenable to tribunals of justice."

The injunction should be denied upon the admitted jurisdictional facts. The statement in the bill is that if the writ is not granted, the plaintiff will be remediless.

The answer shows that the statement is not correct; that the defendant is acting under the proclamation of the president of the United States, and under strict written orders from the president, through the secretary of war. If the plaintiffs are injured, the United States is responsible, and is in duty bound to make reparation , and it will not do to say that the United States is unable to perform, or will refuse to do its duty in the case. Certainly one of its own courts cannot so declare.

Coming to the case upon its merits, assuming that the court has jurisdiction and may properly issue the injunction, we find that the Cherokees have not such title in the outlet under any possible phase of that title as will permit them, or any grantee under them, to carry on mining or other like operations, whether of stone or other materials, or sever and carry away any of the real estate, such as timber or stone.

Upon any reservation, Indians are not permitted to cut and market timber, or destroy it, except so far as the cultivation of the ground and good husbandry requires it should be cut and removed. (*United States v. Cook*, 19 Wall. 591.)

The same rule must apply in the case of stone or other minerals or things which are a part of realty.

The court in the case above cited, and cases therein

referred to, holds that the title which the Indians have in land is a title of occupancy, and is not such a title as would permit them to waste the estate.

While it is not necessary in this case to ascertain what title or interest the Cherokees obtained to the outlet originally, a short statement of that matter may not be out of place, especially as plaintiffs seem to base their whole right upon the quality of title the Cherokees have to the outlet. The facts as to the Cherokee title are these:

In 1818 about one-third of the Cherokees were located in Arkansas and were called the Arkansas or Western Cherokees. The United States had used its troops to drive out from the lands it had given these Cherokees, a number of white families already there.

The land was fair and was being rapidly peopled at the time the government agreed the Cherokees should have it. After they were established there, many harassing disputes arose with white settlers, and the Cherokees sent delegations to Washington, in 1818 and 1821, to seek relief. Upon these visits the Cherokees insisted that they must have an outlet from the west of their Arkansas home tract to the western limit of the United States—which was then the 100th meridian.

A written memorandum of a talk by the president, dated 1818, indicates such a desire, and his favorable consideration of it, and on October 8, 1821, the secretary of war, Mr. Calhoun, wrote a letter to the Cherokees in Arkansas, the original of which the Cherokees yet retain, and a certified copy of which is in the hands of the writer. In this letter the secretary expressly declares that the Cherokees should have a PERMANENT home, and should have an outlet to the west of that extending as far as the sovereignty of the United States extended; but expressly declared that

the Cherokees should not own the soil in that outlet. This letter, addressed to the chiefs and head men of the Western Cherokees, was by them and by the secretary of war clearly understood, depended upon, and thereafter by reference made a part of the subsequent treaties.

By it the meaning of the term "outlet" was clearly established, if its meaning could have been doubted before; and all the negotiations thereafter between the parties as to the outlet were necessarily had with a view to that meaning, so agreed upon and understood by the parties.

It is a recognized principle that where the meaning of a term has once been established under a law, or under a contract, that meaning will continue as to that term in all subsequent laws, and all subsequent contracts, unless a new or modified meaning is clearly intended.

In 1828, Mr. Barbour, secretary of war, representing the president, made a treaty with the Arkansas Cherokees in which the letter just mentioned was referred to, and by reference made a part of the treaty. In the preamble of that treaty it is stated that, Whereas, it is anxiously desired by both the government of the United States and the Cherokee Indians that a *permanent home* should be provided for the Cherokees, which should not thereafter be included within the boundaries of any state or territory, and whereas, the location of the Cherokees in Arkansas was so uncomfortable and unfavorable to their present repose and future prosperity, and the Cherokees resting upon the pledges given them by the president of the United States and the secretary of war, made in 1818, and on the 8th of October, 1821, in regard to the outlet to the west, evidenced by the records in the war department, and be-

ing still anxious to secure a *permanent home*, the parties to the treaty agreed to the articles then following.

It will thus be seen that the treaty of 1828 was expressly based upon, and by reference incorporated the stipulations and pledges contained in the letters of the president of the United States, and of the secretary of war, just mentioned. It will also be observed that, in this treaty of 1828, the Cherokees recognized the difference between the *permanent home*, and the outlet, and that by the very terms of the letter made part of the treaty they acquired no title to the soil of the outlet, but an outlet easement, or right of way, merely.

By article 2 of the treaty, the *permanent home* is declared to be seven millions acres, bounded with great precision on the south, east and north, with a provision that the lines upon the north and south should be extended so far west as would include within the limits seven million acres. That was not for an outlet, but for a *permanent home*. The same articles of the treaty then goes on and provides that the Cherokees shall have a perpetual outlet west, and an unmolested use of all the country lying west of the western boendary of the above described limits to the western limits of the United States. The terms of the treaty show conclusively that the outlet was not to be for the same use as the permanent home. The phrase "permanent home" shows that the remainder of the land considered, to-wit, the outlet, was not to be a permanent home. The word "outlet" then was and yet is a common word in conveyancing where a right of way to mill or market over the lands of another is granted. By article 3, the United States agrees to have the lines of the above CESSION run without delay. The lines, under the description, were of necessity those which bounded the permanent home only, as no other lines were given.

The 2d article of the treaty spoke of the permanent home as "bounded."

In 1833 another treaty was made with the Cherokees in Arkansas. By it some changes were made in the boundary lines of the seven millions acres described by the treaty of 1828; but the use of the term "permanent home" to indicate the seven millions of acres, and the use of the word "outlet" in referring to the lands west of the *permanent home*, is as careful and frequent as in the first treaty.

Under the treaties of 1828 and 1833, the Cherokees in Arkansas took possession of the permanent home conveyed by those treaties, and have ever since remained in possession thereof; but they have never taken possession of or occupied save possibly in a fugitive and transitory way, any part of the outlet. ·

By the treaty of 1833, it was stipulated that the United States should patent to the Cherokees in Arkansas, the lands conveyed by the treaties of 1828 and 1833, including both the *permanent home* and the outlet.

The treaty of 1835 was made with the Eastern Cherokees. By it the United States purchased, for five million dollars, the lands in Georgia still belonging to the Cherokee Nation, and provided that the Eastern Cherokees should join the Cherokees then on the *permanent home* west of the Mississippi, as was contemplated by the treaties of 1828 and 1833, and again declared that a patent should issue for the lands described in those former treaties, including the outlet. In this treaty occurs a most significant provision, namely:

"Whereas, it appears that in the western cession, there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west of the Mississippi.',

Eight hundred thousand acres of additional land,

lying along the north border of the *permanent home*; was promised them by the government, to be included in the patent, to be deeded to them in fee simple.

It will be observed therefore, that there were in the treaties three different tracts. of land and three different descriptions of the kinds of estate given to the Cherokees. The eight hundred thousand acres were to be theirs in fee simple; the seven millions of acres were to be a *permanent home*; and the lands west of the seven million acres were to be an outlet.

There never was any other consideration additional to that in the treaty of 1828 for the conveyance of this outlet. or for any different title to it than was conveyed by that treaty.

By § 3 of the Act of congress approved May 28, 1830, the president of the United States in making exchanges of lands with Indian tribes was authorized to forever grant to them and their heirs or successors the country so exchanged ; and is they preferred the United States would cause a patent to be made and executed to them for the same, the land to revert to the United States if the Indians should become extinct, or abandon the same. This Act of congress was passed before the two treaties with the Cherokees last mentioned. In December, 1838, the land described as the *permanent home*, and the outlet on the west so far as the sovereignty of the United States extended, and the eight hundred thousand acres were included in one patent which was signed by the president.

The patent recited the former treaties and declared that the patent was made pursuant to their provisions. The patent also provided that the lands should revert to the United States in case the Cherokee Nation should become extinct, or abandon the lands so patented. In 1846 another treaty was made between the

government and the Cherokees, all of whom were then residing upon the permanent home, which was intended to harmonize and settle all the rights among the Cherokees to the different Cherokee properties. Article one of the treaty stipulated that the lands then occupied by the Cherokee Nation (meaning the lands heretofore described) should be secured by a patent to the whole Cherokee people, for their common use and benefit.

No further steps were taken to execute a new patent, but the lands described in the treaties and the patent had been uniformly declared by the government, and recognized since, as for the benefit of the whole Cherokee people, instead of of the Arkansas Cherokees only.

In none of the treaties is the outlet confounded with the home tract, and in none of the treaties is there a suggestion of a right in the outlet, save its use as an outlet.

In all these points it seems clear that the Cherokees had a right to use the outlet, as an outlet, and did not consider that they had any other right or interest in it.

So matters stood until 1866, at which time commissioners were sent to the Indian Territory to negotiate treaties with all the Indian tribes, and to bring order out of the confusion incident to the civil war, then just closed. In that year a new treaty was made with the Cherokees which, among other things, provided that the United States might settle civilized Indians on unoccupied lands in the Cherokee country east of the 96th meridian, and might settle friendly Indians in any part of the Cherokee country west of the 96th meridian, upon terms therein stated; but the Cherokee Nation was to retain its right of possession and jurisdiction over all country west of the 96th meridian until sold and occu-

pied, in which event their jurisdiction and right of possession terminated for ever as to the tracts so sold.

By article 31 of that treaty, it was provided that all provisions of former treaties not in conflict with that treaty were reaffirmed and declared in full force, and that nothing in that treaty should be construed as an acknowledgment by the United States, or a relinquishment by the Cherokees, of any claims, under the guaranty of former treaties.

Under this treaty, in 1873, the whole of the Cherokee outlet between the 96th meridian and the Arkansas river was sold and conveyed by the United States and the Cherokees to the Osage Indians, and thereby all title of the Cherokees to that tract was extinguished. By subsequent conveyances other tracts were sold and conveyed by the Cherokees, extending irregularly but almost continuously, from the south line of the Cherokee outlet to the north line thereof, west to the Arkansas river. Thereupon it became impossible for the Cherokees to use, occupy or possess as an outlet, the lands known as the Cherokee outlet. The power to use, and the right to use being gone, the provisions of the patent then became operative, and the Cherokee outlet reverted for non-use, to the United States.

The only land in fact bounded by these treaties was the seven million acres. The treaties repeatedly speak of it distinctly as "bounded," and do not speak of the outlet as "bounded."

The treaty of 1828, article 2, says:

"The United States agree to possess the Cherokees ——of seven million acres of land, to be *bounded* as follows, viz: ——. In addition to the seven million acres thus *bounded*, the United States further guarantee to the Cherokees a perpetual outlet west, etc.——"

The treaty of 1833, in the preamble, quotes *verbatim*

the above article 1, and then proceeds in article 1 of the new treaty:

"The United States agree to possess the Cherokees ————of seven million acres of land to be *bounded* as follows, viz: ————. In addition to the seven million acres of land thus provided for and *bounded*, the United States further guarantee to the Cherokee Nation a perpetual outlet west, etc.————"

Article 4 says:

"In consideration of the establishment of new *boundaries* in part of the land ceded to the Cherokee nation. ————." (The former boundaries had to be changed slightly, because they included some lands taken by the Creeks.)

The Cherokees have never occupied, possessed, or attempted to exercise jurisdiction over the outlet; but on the contrary have expressly refused to exercise such jurisdiction. They have not considered that they owned and occupied, or possessed and occupied, or had jurisdiction over the outlet as they did the permanent home. That they did not is proven by the following facts:

1. They have not, except possibly in a fugitive and transitory manner, ever occupied or attempted to occupy the outlet.

2. The Cherokee Constitution, adopted September 6, 1839, provides that the *boundary* of the Cherokee nation shall be that prescribed in the treaty of 1833. It will be observed that this was after the patent to the Cherokees was issued.

The Cherokee Constitution was amended in 1866, and this language as to the *boundary* was retained.

3. The Cherokee laws of long standing provide that: "The *Cherokee Nation* shall be divided into nine districts as follows, to-wit:————." The districts are then each bounded, and cover the home tract, and do not cover the outlet or any part of it. (See Cherokee laws 1881, pp. 193, 196.)

The westernmost of these districts is Cooweescoo-wee, and its western limit is expressly declared in these laws to be the 96th meridian. Those laws were enacted long prior to the year 1866.

By these Cherokee laws a district court is provided for each of the districts, and three circuit courts are put over the nine districts. (See Cherokee laws 1871, pp. 93, 94.)

No Cherokee court or officer, however, is given any jurisdiction whatever in the outlet. If a Cherokee murder a Cherokee in the outlet, no Cherokee court has any jurisdiction whatever of the offense, and has never had. If a person, not a Cherokee, there murder a Cherokee, no Cherokee court has jurisdiction.

No Cherokee official can exercise any power or authority whatever in the Cherokee outlet.

It is therefore absolutely certain that the Cherokees have not and never had, and their laws never claimed, any jurisdiction over the outlet; but by the limitations their laws expressly disclaim it.

A constant stumbling block in the consideration of the Cherokee title has been the misuse of the word "patent." The word patent is simply a technical term for that government writing, which if given by a private individual would be called a deed. A patent is merely a government deed, and is evidence of title. It has been repeatedly held that where the land had theretofore been contracted for, and the necessary acts under the contract performed, a patent is simply evidence of the conveyance already made. (2 Wall. 525; 9 Wall. 617.)

An estate in land can be conveyed by the government without a patent, and frequently the title from the government passes long before the patent issues. Where a homesteader is given a final certificate, title

passes to him without a patent, and the patent thereafter issued is merely evidence of the fact that title has passed.  A government may, and often does, convey lands by treaty.   In this case, by its treaties the government conveyed the lands to the Cherokees, and agreed that a patent evidencing their title should be given thereafter.   Under these treaties, the Cherokees took possession of these lands as owners.

Years after the treaties were made, and the title had passed, and after the Cherokees had taken possession of the land, a patent did issue as promised by the treaties. No estate could pass by the patent because it had already passed.   It is usual and proper for private persons to grant an easement by deed, and entirely proper for the government of the United States to grant an easement by treaty or patent.   And where the government grants an easement, the extent and character of the easement should be made specific aud certain by a writing evidencing that conveyance.   This writing technically would be called a patent.   A conveyance by treaty or patent does not impart a fee, any more than does a conveyance by deed.

The government could not convey an easement or lease or estate less than a fee except by treaty or patent.

The United States supreme court has repeatedly declared that the treaties of 1828 and 1833 conveyed the lands to the Cherokees, and that the treaties of 1835 with the eastern Cherokees, and of 1846 with all the Cherokee factions, were merely to confirm to all the Cherokees the possession of the seven million acres already taken by the western Cherokees, and of which they were in full possession long before the treaty of 1835 was made.   (*United States v. Rogers*, 4 How. 572; *Holden v. Joy*, 17 Wall. 250, Cherokee Trust Funds, 117 U. S. 301.

The supreme court has frequently declared that :

"Purchases of land made by Indian treaties by the authority of the United States, have always been held good by ratification of the treaty, without any patent from the United States." (*Mitchell v. United States*, 9'Pet. 711.)

And that where a conveyance is made by a treaty, and a patent thereafter issued, the *patent* does not convey any interest in the land, but is simply evidence of the interest before conveyed, and is good only so far as it conforms to the authority therefor in the treaty. (*Holden v. Joy*, 17 Wall. 250 ; *Stone v. U. S.*, 2 Wall. 525.)

It is also an old an well established rule that confirmation by congress of a claim of title to land is, "higher evidence of title than a patent, as it is a direct grant of the fee by the government itself, whereas the patent is only the act of the ministerial officers." (*Grignon v. Astor*, 2 How. 318-344 ; *Doe v. Esclava*, 9 How. 466-7.)

"After such confirmation, no patent is necessary to confer a perfect legal title." (*Doe v. Esclava*, 9 How. 477.)

The conveyance of these lands having been made by the treaties, and the land then taken possession of by the Cherokees as their lands under the treaties, the subsequent acts of the parties came within the rule of *Whitney v. Morris*, 112 U. S. 693, which declares that a direct legislative grant of public lands is the highest muniment of title, and is not strengthened by a subsequent patent to the same land. In the contemplation of law a patent may have either of two offices, which are carefully distinguished by the supreme court.

"It is a conveyance by the government when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title, or of

such equities respecting the claim as justify its recognition and confirmation." (*Langdeau v. Haines*, 21 Wall. 529; *Morrow v. Whitney*, 95 U. S. pp. 554, 555.)

This office of the patent was sufficient reason for its being asked for by the Cherokees, and executed by the government.

In this case its operation was to confirm the previovsly existing title. The patent was not intended to be a *conveyance*, and when issued it could not increase .r diminish the title which the Cherokees had then held ·or years, to the lands in question. In a similar case, .he supreme court has said that treaties like this must ·est on the words used. "Nothing adding thereto, nothing diminishing." (*Leavenworth v. U. S.*, 92 U. S. 75.

And of this identical patent the court has said, as to one provision in it not provided for by the treaties :

"Strong doubts are entertained whether that condition in the patent is valid, as it was not authorized by the treaty under which it was issued·" (*Holden v. Joy*, 17 Wall. 250.

"If, therefore, the terms of the patent exceed the scope of the grant in the treaties, it is as to the excess void ; as those cases declare, and as is declared in a case almost identical with this, namely, *U. S. v. Stone*, 2 Wall. 525.

"That case is very plain in showing that public documents are written to mean, 'and held to mean what they say even where an Indian reservation and patent are concerned, and is as follows :

"By treaties of 1818 and 1829, the United States promised and gave the Delaware Indians for a "permanent home," the lands between the Kansas and Missouri rivers, extending to Camp Leavenworth.

"The reservation was surveyed and platted by McCoy (who also surveyed the Cherokee tracts), in 1830, (the same year the first Cherokee survey was made), and the survey showed and fixed the until then unfixed south boundary line of Camp Leavenworth.

"By a treaty of 1854, the Delawares ceded part of their reservation, and provided that the United States should survey the tract ceded, and also should survey the tract retained as their 'permanent home,' of which. when the Indians so desired, unform portions were to be assigned to each person or family.

"By a treaty in 1860, certain chiefs were to select parts of the permanent home tract, which should then be patented to them by the president.

"In 1861 the secretary of the interior decided that the lands between Camp Leavenworth proper, and the south line as fixed by the McCoy survey, belonged to the Delaware permanent home, as such had them surveyed, and the president issued patents for the lands to individual Indians.

"The patents recited the provisions of the treaty of 1860, and went on to grant the particular tracts, 'in conformity with the provisions, as above recited of the aforesaid treaty.'

"In 1862 the United States brought suit to cancel the patents for these lands belonging to the Military Reservation.

"In argument it was urged that the recitals of the patent were conclusive as to the character of the lands included in it, and that the recital in the patents that the lands therein described were conveyed 'in conformity with. the provisions of the treaty' estopped the government to deny that the lands in the patent were part of the reservation, and properly conveyed in the patent.

"But the court held—as all the cases in effect hold— that the president in issuing a patent, acts ministerially, and when the patent is issued unadvisedly, or by mistake, or in excess of authority, the patent is unauthored and void, and the government is not estopped.

"That is a leading case, frequently cited by the Federal courts, precisely in point in this case, and shows that a patent to lands intended to be issued pursuant to a treaty, but covering some lands not granted by the treaty, is void as to the lands not granted by the treaty." (The Delawares had as counsel Messrs. Stin-

son and Browning and Ewing and Carlisle, who were among the very best lawyers of their day.)

In the present case, however, the terms of the patent do not in any wise exceed the grant in the treaties, but carefully declares that the patent to those lands is executed pursuant to them, and subject to all the rights reserved by the United States in and by those treaties, including, of course, what is expressly stated in the treaties, and what by reference is incorporated in them, and including therefore the reservation of the right to the soil as declared in the letter of October 8, 1821, to which those treaties refer, and upon which they are in part based, and which by reference is made part of them.

It being then established that the treaties purported to and did convey title; that the patent was made pursuant to the treaties, and neither attempted to nor did convey any title in addition to that in the treaties; that an easement as well as a fee may be conveyed by treaty; and that the courts hold a title by treaty confirmed by congress a higher and better title than a patent; that a patent issued *after* the title has been conveyed is merely evidenciary (it cannot have any other function); let us notice the decisions of the Supreme Court of the United States as to the title and the quantity of land conveyed to the Cherokees.

It has declared that those treaties conveyed these lands as a place of *domicile* for the tribes. (*United States v. Rogers*, 4 How. 527.)

In *Holden v. Joy, supra*, in four different places it declared that the amount of land conveyed to the Cherokees was seven million acres. (See pages 237, 238, 240 and 241.)

In the Cherokee trust fund case, *supra*, it declared in three different places (pages 299, 300, 301), that the

amount of land conveyed was seven million acres. The first of these three decisions was by Chief Justice Taney, the second by Justice Clifford, and the third by Justice Field, each of whom was habituully careful and accurate in the use of language. It is not too much to say, therefore, that the amount of land conveyed by these treaties has been intelligently and deliberately recognized and stated by the Supreme Court of the United States. The same conclusion has been carefully stated by Judge (now Justice) Brewer, in *United States v. Soule*, 30 Fed. Rep. 921.

Not only has the judicial department of the government clared that the Cherokees have no leasable interest in the outlet, but the administrative department, through its law officers, has spoken with equal emphasis. Attorney General Garland, under date of August 14, 1886, gave his opinion (Opinions Attorneys General, vol. 18, 486), that citizens of the Choctaw Nation could not make mining leases for mines in the Choctaw reservation. This court knows that the Choctaw Indians have a patent to their lands of practically the some character as the Cherokees have for their home tract. Attorney General Garland, under date of July 21, 1885 (see Opinions Attorneys General, vol. 18, 235), declared that the Cherokees could not lease lands for grazing purposes in the Cherokee Outlet. Attorney General Miller and Assistant Attorney General Shields under the sanction of Attorney General Miller, have also declared that the Cherokees have no power to lease lands in the Cherokee Outlet. The opinions of the attorneys general expressly declare that *no lease* or other conveyance of lands or any title or claim thereto shall be of any validity unless made as prescribed in the United States Statutes.

By § 2116, United States Revised Statutes, it is declared that *no one* shall obtain any lease or other

conveyance of any Indian lands, save under the author-
ity of the United States. It will be observed that the
prohibition covers *any* person whatsoever, whether
alien, citizen or Indian. This inhibition applies as well
to persons who are members of the Indian tribes or na-
tions as to persons not members of such tribe or na-
tion.

The rule is intended to and does secure the land to
the Indians in their *tribal* capacities, and against not
only outsiders, but grasping members of the tribe as
well; for, if the acquisitive members of the tribe might
by contract with the tribe, obtain estates for years in
the tribal lands, these years might be ten, or one hun-
dred, or one thousand, and if they might obtain a lease
or license as to part of the lands, they might obtain a
lease to all the tribal lands for a term far beyond the
lives of the members then living, leaving the tribe ab-
solutely without a reservation.

This is exactly the evil which the statute is intended
to prevent. If the Cherokee Nation in the present case
can lease the stone quarry in the outlet, and a hundred
acres of land, it can lease the stone quarry and ten
thousand acres of land, or the stone quarry and six mil-
lion acres of land; and if it can lease the stone quarry
and six million acres of land for farming purposes and
quarrying purposes, it can lease the stone quarry
and six million acres for farming and grazing purposes,
and the Cherokee can employ, or under permits bring
in, not only the four white men mentioned in the bill,
but four hundred or four thousand white men; and if
the Cherokees may lease this land for the quarrying of
stone or farming purposes, it may also lease it for other
purposes not including the quarrying of stone or farm-
ing, e. g., for grazing purposes.

The mere statement shows that congress did not in-

tend to permit and that the law was framed so as to prohibit such a result.

From the foregoing we think it clear that:

1. The Cherokees have not a fee simple title to the outlet, and never had any title to the outlet except such as the secretary of war indicated in his letter, and as was agreed upon by them at that time—an easement which did not include a right to the soil.

2. The Cherokees understood that fact thoroughly and never lived upon or attempted to use the outlet, and never attempted to assert any jurisdiction over the outlet by judicial proceedings or otherwise.

3. The Cherokees, by the treaties and the patent, and the reference in the treaty of 1835 to the Act of congress dated May 28, 1830, recognized the fact that they were to hold the outlet only so long as they used it.

4. The Cherokees ceased to use the outlet when they transferred the eastern part thereof to the Osages, and to the little tribes along the western side of the Arkansas river.

5. Neither the Cherokee nation nor a Cherokee citizen could lease the outlet or any part of it to any person whomsoever for any purpose whatsoever.

6. The license alleged in the bill, from the Cherokees to plaintiffs, if any, was in violation of § 2116 of the U. S. Rev. Statutes, and is void.

7. The taking of stone from the Cherokee outlet in the manner described in the bill is a waste of the estate which the government will not permit.

8. The defendant was acting under the orders of the President of the United States, and under the proclamation of the president, and while so acting, the remedy for persons damnified by his action is not by injunction, but by resort to the Federal courts for damages.

9. That the plaintiffs, at the time they filed the complaint in this cause, were wrongfully upon the Cherokee outlet, and have no standing to come into a court of equity for support in their wrongful act.

Attached to this brief as a part thereof are the letter of Secretary Noble to Hon. I. S. Struble, Chairman of the house committee on territories, dated February 13, 1891; and a report dated February 11, 1891, by Mr. Struble from the committee on territories, as to the Cherokee outlet; and a report dated February 27, 1891, from Mr. Perkins, chairman of the house committee on Indian affairs, on the same subject.

Respectfully submitted;

HORACE SPEED,

Counsel for the United States.

The following opinion was delivered by

GREEN, C. J.: This is a bill in chancery, on the Federal side of the court, for an injunction against the defendant to restrain him from doing certain acts against the persons and property of the complainants, alleged to be in violation of the rights of complainants as citizens of the Cherokee Nation of Indians, and Cherokees by blood, and, therefore, unlawful, and for the doing of which, complainants have no adequate remedy at law.

The bill alleges that complainants are citizens of the Cherokee nation, and Cherokee Indians by blood. That, in 1883, they established a farm and improvements on what is known as the Cherokee Outlet, and within the jurisdiction of this court, and in accordance with the laws, usages, and customs of the Cherokee Nation; and that the said Cherokee Outlet is in pos-

session of, and owned by the Cherokee Nation in fee simple.

That complainants discovered on the farm a stone quarry, and, for the purpose of operating the same obtained a license from said nation in conformity with the laws and usages of the same, for a term of ten years, and that such license has not expired.

That complainants proceeded to open the quarry, and to mine and carry on the business of shipping stone; that they cleared the ground, made suitable openings to quarry and get out the stone, erected buildings and other conveniences for their laborers and employes, and built a switch, or spur, railroad to their quarry.

That land was put in cultivation, derricks were purchased and placed in position with necessary tools, and a full and complete plant was constructed to carry on the business of quarrying and shipping stone; and that complainaints have expended and laid out about six thousand dollars.

That they have continuously been, and now are conducting the business of quarrying and selling and shipping stone from said quarry, and delivering the same in the state of Kansas, as contracted for and ordered from time to time ; that they have built up and established a good business, and, in due course of business, have entered into numerous contracts for the sale and delivery of stone, which have not been executed and complied with.

That complainants are upon the Cherokee Outlet, and it possession of their premises, under and by virtue of their farming improvements, and by virtue of the said license from the authorities of the Cherokee Nation.

That being citizens of the Cherokee Nation to whom said outlet belongs, under the laws and constitution of

the United States, and the treaties existing between the United States and the Cherokee Nation, they have a right to locate, be, and remain upon said outlet with their improvements and holdings.

That defendant, Goldman, is first lieutenant of the Fifth United States Cavalry; a white man, having under him troop "K" of said Fifth Cavalry, and a detachment of twenty Indian scouts; that on the 28th day of February, 1891, the said defendant, with his command, came to said quarry, where complainants were at work, and with force and arms unlawfully and violently took possession of said quarry without authority of law; that defendant claimed to be acting under orders from the war department, directing that all intruders should be removed from said Cherokee Outlet; and that he was ordered by said war department to destroy the track of said railroad, belonging to complainants, and all the buildings and improvements at and around said quarry, and to remove all tools, derricks and other machinery, in and about said quarry, over the line and into the state of Kansas; and that such removal would be made by force, on, or before 10 o'clock a. m., March 2, 1891; and that the said defendant will proceed to do so, unless restrained from so doing by writ of injunction.

That there is no right, power, or authority lawfully vested in, given, granted or conferred upon the said defendant to remove the complainants, and to destroy the said premises; that, if the threatened acts of the defendant are carried out, the business of complainants built up and established by years of industry and toil, will be ruined and destroyed, and complainants will be involved in a multiplcity of suits with their patrons, with whom they have contracts unfulfilled for the furnishing and delivering of stone.

That the destruction of complainants' plant, buildings and track will wholly destroy and lay waste their

farming improvements and quarry, and cause com-
plainants *irreparable* injury and damage, as said de-
fendant and those acting under him are wholly insol-
vent, and, for that reason, a judgment at law would
be useless, and could not be collected.

That complainants are not intruders upon said Chero-
kee Outlet, within the scope and purview of the laws
of the United States, and the treaties made with the
Cherokee Nation, or the laws governing trade and in-
tercourse with the Indian tribes, but are lawfully there-
on.

To this bill of complaint, defendant, Goldman, ap-
peared and filed an answer, alleging, *inter alia*, as fol-
lows:

That he does not know, and does not believe, that
complainants are citizens of the Cherokee Nation, and
Cherokees by blood. He does not admit that com-
plainants established, or located improvements on what
is known as the Cherokee Outlet, as alleged in their
bill of complaint. He denies that the Cherokee Outlet
is within the jurisdiction, or possession of the Cherokee
Nation, and denies that said outlet belongs to the
Cherokee Nation, *in fee simple*, or otherwise.

He does not know whether complainants discovered
the stone quarry, and does not know whether they
obtained license from the Cherokee Nation, as alleged
in their bill of complaint, but demands proof.

He denies any knowledge of the opening and devel-
oping of the quarry, and the making of the switch ;
and does not know by whom the track and other con-
veniences, tools and derricks, and the quarry plant
were brought to, or placed upon, or about said quarry,
or the cost or value of the same, but demands proof.

That, on the 28th day of February, 1891, he found at
said quarry a large number of persons, claiming differ-
ent rights and interests therein, among whom was the

complainant, Jordan, but not the complainant, Bushy-head, or his alleged guardian.

That some of these persons were then, and for some time had been, carrying on the business of quarrying stone at said quarry, and shipping stone from said quarry, and delivering stone in the state of Kansas under contract therefor, and at such other places as the contracts provided. That such business was a considerable business, and, in the progress thereof, large quantities of stone had been taken from the quarry, and that very large quantities were intended to be taken from said quarry for general traffic ; and that said quarry was and is within the Cherokee Outlet.

That among persons in and about said quarry were citizens of the United States ; and that all of said persons were employed and engaged in working in and about said quarry, and were claiming some interest, or right, in the machinery, or plant, or quarry, or the stone taken, or intended to be taken therefrom.

That under orders from the war department, dated Dec. 31, 1890, and the proclamation of the president dated February 17, 1891, defendant was directed to proceed to the Cherokee Outlet, with the troops and Indian scouts mentioned, and drive out all persons unlawfully in the Cherokee Outlet, and all cattle and other stock unlawfully therein.

The said orders were properly issued by the war department under the directions of the president of the United States, and directed to the proper officer by the president, and came to the defendant as an officer of the army of the United States, and to the troops and Indian scouts, who were then in the army of the United States, and under the immediate command of the defendant.

That in the execution of these orders, the defendant

proceeded to the Cherokee Outlet, with said troops and Indian scouts, and removed divers and sundry persons resident, or being, in said outlet ; and under said orders proceeded to the said quarry, and there directed the persons in and about the said quarry, including the said complainant, Jordan, to remove from said quarry, and from said Cherokee Outlet, and to cease quarrying stone at said quarry ; and that said direction and order, by the defendant, to the persons at said quarry, was intended to cover any and all persons at said quarry, or claiming any interest therein.

The defendant is informed and believes, that said Cherokee Outlet did not, and does not, belong to the Cherokee Nation, or the Cherokee people in fee simple or otherwise ; and that the complainants have no right, as against the United States, to operate a stone quarry in said outlet, in the manner stated in said bill of complaint, or otherwise, under license issued by said Cherokee Nation. That the complainants have no right, except by consent of the United States, to open and develop a quarry of stone in said outlet, or to remove stone from said outlet.

That complainants have no right to locate, or put improvements on said outlet ; and have no right to employ white men, or other persons, citizens of the United States, or aliens, to go in, or upon, said outlet and quarry stone therein for transportation, or use elsewhere. That complainants are intruders upon said outlet, except, possibly, as they may use the same for passing over, as provided by the treaties of 1828 and 1833.

Complainants filed a general replication to the answer of the defendant, and, on the hearing of the application for a temporary injunction, submitted affidavits, supporting substantially the facts stated in the

bill of complaint ; and the cause has been argued and submitted for decision, as if upon issue and full proof.

As there is no contention in regard to the facts of this case, the important question which lies at the very threshold of the inquiry is, what title, or interest, has the Cherokee Nation to, or in, the Cherokee Outlet? And, in determining this question, it is not necessary to review the history of the Cherokee Indians, and the numerous treaties made by the United States with the Cherokee Nation, prior to the treaty of the sixth of May, one thousand eight hundred and twenty-eight.

By the treaty of the sixth of May, one thousand eight hundred and twenty-eight, it is recited in the *preamble* as follows :

" Whereas, it being the anxious desire of the government of the United States to secure to the Cherokee Nation of Indians, as well those now living within the limits of the Territory of Arkansas as those of their friends and brothers who reside in states east of the Mississippi, and who may wish to join their brothers of the west, a *p rmanent home,* and which shall, under the most solemn guarantee of the United States, be and remain theirs forever, a home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a territory or state, nor be pressed upon by the extension, in any way, of any of the limits of any existing territory or state ; and

" Whereas, the present location of the Cherokees in Arkansas, being unfavorable to their present repose, and tending, as the past demonstrates, to their future degradation and misery; and the Cherokees being anxious to avoid such consequences, and yet not questioning their rights to their lands in Arkansas, as secured to them by treaty, and resting also upon the pledges given them by the president of the United States, and the secretary of war, of March, 1818, and 8th of October, 1821, in regard to the *outlet* to the west, and as may be seen on referring to the records of the war department, still being anxious to secure a *per-*

*manent home*, and to free themselves and their posterity from an embarrassing connection with the territory of Arkansas, and guard themselves from such connections in future."

It appears from this *preamble*, that it was the anxious desire of the government of the United States, as well as the Cherokees, to secure to the Cherokees *a permanent home*, which should be outside the limits of any state or territory, and, with that *permanent home*, to secure to them an *outlet* to the west; and to that end the treaty provided as follows:

"*Article* 2. The United States agree to possess the Cherokees, and to guarantee it to them forever, and that guarantee is hereby solemnly pledged, of seven millions acres of land, to be bounded as follows, viz: Commencing at that point on Arkansas river, where the eastern Choctaw boundary line strikes said river, and running thence with the western line of Arkansas, as defined in the foregoing article, to the southwest corner of Missouri, and thence with the western boundary line of Missouri till it crosses the waters of Neosho, generally called Grand river; thence due west to a point from which a due south course will strike the present northwest corner of Arkansas territory; thence continuing due south, on and with the present western boundary line of the Territory to the main branch of Arkansas river; thence down said river to its junction with the Canadian river; and thence up and between the said rivers, Arkansas and Canadian, to a point at which a line running north and south, from river to river, will give the aforesaid seven millions of acres. In addition to the seven millions of acres thus provided for and bounded, the United States further guarantee to the Cherokee Nation *a perpetual outlet west*, and a free and unmolested use of all the country lying west of the western boundary of the above described limits, and as far west as the sovereignty of the United States and their right of soil extend."

After the making of this treaty with the Cherokee Nation, it was discovered that the boundaries of the seven millions of acres, as defined by the treaty, in-

cluded lands that had been ceded to the Creek Nation of Indians, in 1826, by treaty with the United States; and by the first article of the treaty of the fourteenth day of February, one thousand, eight hundred and thirty-three, the boundaries of the seven millions of acres are corrected, and the same provision is made for a *perpetual outlet* west, as was made by the second article of the treaty of 1828. Said article provides as follows:

"*Article 1.* The United States agree to possess the Cherokees, and to guarantee it to them forever, and that guarantee is hereby pledged, of seven millions of acres of land, to be bounded as follows, viz: Beginning at a point on the old western territorial line of Arkansas territory, being twenty-five miles north from the point where the Territorial line crosses the Arkansas river; thence running from said north point south, on the said territorial line, to the place where said territorial line crosses the Verdigris river; thence down said Verdigris river to the Arkansas river; thence down said Arkansas to a point where a stone is placed opposite to the east or lower bank of Grand river at its junction with the Arkansas; thence running south forty-four degrees, west one mile; thence in a straight line to a point four miles northerly from the mouth of the north fork of the Canadian; thence along the said four-mile line to the Canadian, thence down the Canadian to the Arkansas; thence down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river; and running thence with the western line of Arkansas territory, as now defined, to the southwest corner of Missouri; thence along the western Missouri line to the land assigned to the Senecas; thence on the south line of the Senecas to Grand river; thence up said Grand river as far as the south line of the Osage reservation, extended, if necessary; thence up and between said south Osage line, extended west if necessary; and a line drawn due west from the point of beginning, to a certain distance west, at which a line running north and south from said Osage line to said due west line will make seven

millions of acres within the whole described bound-
aries. In addition to the seven millions of acres of
land, thus provided for, and bounded, the United
States further guarantee to the Cherokee Nation a per--
petual outlet west and a free and unmolested use of all
the country lying west of the western boundary of said
seven millions of acres as far west as the sovereignty of
the United States and their right of soil extend: *Pro--
vided, however*, That if the saline, or salt plain, on the
great western prairie shall fall within said limits pre-
scribed for said outlet, the right is reserved to the
United States to permit other tribes of red men to get
salt on said plain in common with the Cherokees; and
letters-patent shall be issued by the United States as
soon as practicable for the land hereby guaranteed."

On the 29th day of December, 1835, at New Echota,
in the State of Georgia, and for the purpose of uniting
the Cherokees east and west of the Mississippi, a new
treaty was made between the United States and the
Cherokee Nation; the second and third article of which
provide as follows:

"*Article 2.* Whereas, by the treaty of May 6, 1828,
and the supplementary treaty thereto of February 14,
1833, with the Cherokees west of the Mississippi, the
United States guaranteed and secured to be conveyed
by patent, to the Cherokee Nation of Indians, the fol-
lowing tract of country: Beginning at a point on the
old western territorial line of Arkansas Territory,
being twenty-five miles north from the point where
the territorial line crosses the Arkansas river; thence
running from said north point south on the said terri-
torial line where the said territorial line crosses Verdi--
gris river; thence down said Verdigris river to the
Arkansas river; thence down said Arkansas to a point
where a stone is placed opposite the east or lower bank
of Grand river at its junction with the Arkansas;
thence running south, forty-four degrees west, one
mile; thence, in a straight line, to a point four miles
northerly from the mouth of the North Fork of the
Canadian; thence along said four-mile line to the Can-
adian; thence down the Canadian to the Arkansas;

thence.down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river, and running thence with the western line of Arkansas Territory, as now defined, to the southwest corner of Missouri; thence along the western Missouri line to the land assigned the Senacas; thence on the south line of the Senacas to Grand river; thence up said Grand river as far as the south line of the Osage reservation, extended if necessary; thence up and between said south Osage line, extended west if necessary, and a line drawn* due west at the point of beginning to a certaid distance west, from which a line running north and south from said Osage line to said due west line will make seven millions of acres within the whole described boundaries. In addition to the seven millions of acres of land thus provided for and bounded, the United States further guarantee to the Cherokee Nation a perpetual outlet west, and a free and unmolested use of all the country west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of *soil* extend. *Provided, however,* That if the saline or salt plain on the western prairie shall fall within said limits prescribed for said outlet, the right is reserved to the United States to permit other tribes of red men to get salt on said plain in common with the Cherokees; and letters-patent shall be issued by the United States as soon as practicable for the land hereby guaranteed; and whereas it is apprehended by the Cherokees that in the above cession there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west of the Mississippi, the United States in consideration of the sum of five hundred thousand dollars therefor, hereby covenant and agree to convey to the said Indians and their descendants, by patent in fee simple, the following additional tract of land situated between the west line of the state of Missouri and the Osage reservation, beginning at the southeast corner of the same, and runs north along the east line of the Osage lands fifty miles to the northeast corner thereof; and thence east to the west line of the state of Mis-

souri; thence with said line south fifty miles; thence
west to the place of beginning; estimated to contain
eight hundred thousand acres of land; but it is express-
ly understood that if any of the lands assigned the
Quapaws shall fall within the aforesaid bounds the same
shall be reserved and excepted out of the lands above
granted, and a pro rata reduction shall be made in the
price to be allowed to the United States for the same
by the Cherokees.

"*Article* 3. The United States also agree that the
lands above, ceded by the treaty of Feb. 14, 1833, in-
cluding the outlet, and those ceded by this treaty, shall
all be included in one patent executed to the Cherokee
Nation of Indians by the president of the United States
according to the provisions of the act of May 28, 1830.
It is, however, agreed that the military reservation at
Fort Gibson shall be held by the United States. But
should the United States abandon the post and have
no further use for the same it shall revert to the Cher-
okee nation. Tne United States shall always have the
right to make and establish such posts and military
forts in any part of the Cherokee country as they may
deem proper for the interest and protection of the same,
and the free use of as much land, timber, fuel, and ma-
terials of all kinds for the construction and support of
same, as may be necessary; provided, that if the pri-
vate rights of individuals are i nterfered with, a just
compensation therefor shall be made."

The Act of congress of May 28, 1830, referred to in
the treaty of 1835, by the first and second sections of
the Act, authorized the president of the United States
to exchange certain lands west of the Mississippi
river with any tribe, or nation, of Indians residing
within the limits of any of the states or territories, and
with which the United States had existing treaties, for
the whole or any portion of the territory claimed, or
occupied, by such Indians; and the third section of the
Act was in these words:

"And be it further enacted, that in the making of
any such *exchange* or *exchanges*, it shall and may be

lawful for the president solemnly to assure the tribe or
nation with which the exchange is made, that the
United States will forever secure and guarantee ·to
them and their heirs or successors, the country so *ex-
changed* with them, and if they prefer it, that the
United States will cause a patent· or grant to be made
and executed to them for the same; *provided always*
that such lands shall revert to the United States if the
Indians become extinct *or abandon the same.*"

On the 31st day of December, 1838, the president of
the United States, in pursuance of the provisions of the
treaties of 1828, 1833 and 1835, with the Cherokee
Nation, made and executed to said nation a patent, in
which the provisions of said treaties with reference to
the seven million acres for a *permanent home*, and the
eight hundred thousand acres additional, and the
Cherokee outlet are set out, and with the following
*granting* and *habendum* clauses:

"Therefore, in execution of the agreements and
stipulations contained in the said several treaties, the
United States have *given* and *granted*, and by these
presents do *give* and *grant* unto the said Cherokee
Nation, the two tracts of land so surveyed and herein-
before described, containing in the whole *fourteen mil-
lions, three hundred and twenty-four thousand, one
hundred and thirty-five acres, and fourteen hundredths
of an acre. to have and to hold the same*, together with
all the rights, privileges and appurtenances thereunto
belonging to the said *Cherokee Nation forever:* subject,
however, to the right of the United States to permit
other tribes of red men to get salt on the salt plain on the
western prairie referred to in the second article of the
treaty of the twenty-ninth of December, one thousand
eight hundred and thirty-five, which salt plan has been
ascertained to be within the limits prescribed for the
outlet agreed to be granted by said article; and sub-
ject also to all the other rights reserved to the United
States, in and by the articles hereinbefore recited, to
the extent and in the manner, in which the said rights
are so reserved; and subject also to the condition pro-

vided by the Act of congress of the twenty-eighth of May, one thousand eight hundred and thirty, referred to in the above recited third article, and which condition is, that the lands hereby granted shall revert to the United States, if the said Cherokee Nation becomes extinct, or *abandons the same.*"

Now, the question is, what kind of title do these several treaties, and the Act of 1830, and the patent of 1838, give the Cherokee Nation to the lands described in the treaties and patent, including the Cherokee Outlet? And, in determining this question, it matters not whether the title of the Cherokee Nation shall be derived from the several treaties, or from the patent issued in pursuance of such treaties, so far as the title to the Cherokee Outlet is concerned. The condition in the patent, however, that the lands shall *revert* to the United States, if the Cherokee Nation shall *abandon the same*, is not found in the treaties; and serious doubts have been expressed as to the validity of the condition in the patent, for the reason that it was not authorized by the treaties under which it was issued. (*Holden v. Joy*, 17 Wallace, 250.)

The title of the Cherokee Nation to the *seven million acres of land*, known as their *permanent* home, and the *eight hundred thousand acres* additional has already been passed upon by the courts, and would seem to be no longer in question. In fact, as to the *eight hundred thousand acres*, that tract of land was purchased by the Cherokee Nation, for the sum of *five hundred thousand dollars*, and by the treaty of 1835, the United States covenanted and agreed to convey the same by patent, in fee simple, and the same was conveyed by the patent of 1838. And as to the *seven million acres*, the Supreme Court of the United States in the case of the *Cherokee Nation v. Kansas Railway Co.*, 135 U. S. 656, concedes that the Cherokee Nation holds the same in fee simple. The court there says:

"The fact that the Cherokee Nation holds these lands in fee simple, under patents from the United States, is of no consequence in the present discussion."

Again in the case of *Holden v. Joye, supra*, involving the title of the Cherokee Nation to the *eight hundred thousand acres*, it is said that the condition in the patent that the lands shall *revert* to the United States, if the Cherokee Nation shall *abandon* the same, if a valid condition, reduces the estate to less than a fee simple, and makes it an estate upon a condition subsequent.

The court says:

"Strong doubts are entertained whether that condition in the patent is valid, as it was not authorized by the treaty under which it was issued. By the treaty the United States covenated and agreed to covey the lands in fee simple title, and it may well be held that if that condition reduces the estate conveyed to less than a fee, it is void; but it is not necessary to decide that point, as it is clear that if it is valid it is a condition subsequent, which no one but the grantor in this case can set up under any circumstances."

In the case of the *United States v. Reese*, 5, Dillon, 405, an information was filed against the defendant for unlawfully cutting timber on lands situated in the Cherokee Nation, being a part of the *seven million acres* described in the several treaties and in the patent of 1838; and it became necessary for the court to determine, in the case, what estate the Cherokee Nation had in, and by what title they held, these lands. The question was raised upon a demurrer to the information, and Judge Parker, in passing upon the demurrer, said:

"But suppose the condition contained in the patent is void, let us see what effect that has upon the title. The condition is that the lands *revert* to the United States if the said Cherokees become extinct or abandon the same. Now, the first of these conditions is one which would be silently engrafted on the grant inde-

pendent of any express words.    When there is a grant and the grantee and his heirs become extinct, the land encheats to the state, whether the grantee be an individual, or a body of individuals.    In an ordinary patent, absolute from the government,  the implied right of escheat to the sovereign lies behind the patent.    In this case it is expressed."

Therefore, that expressed condition does not take away the character of a fee simple title.    But the other one, against abandonment, does.    This leaves the title less  than  a fee.    But  what character does  it have ? Blackstone, (book 2d  Chap. 7, p. 109,) says:

"A base, or qualified fee is such a one as hath a qualification subjoined thereto, and which must be determined whenever the qualification annexed to it is at an end.*  As in the case of a grant to A. and his heirs, tenants of the manor of Dale.    In this instance, when— ever the heirs of A. cease to be tenants of the manor the grant is entirely defeated."    *    *    *

This estate is a fee, because by possibility it may endure forever in a man and his heirs.    Yet, as that duration depends upon the concurrence of collateral circumstances which qualify and debase the purity of the donation, it is, therefore, a qualified or base fee.

Chancellor Kent (vol. 4. p. 10 of his Commentaries) says:

"A qualified, base, or determinable fee is an interest which may continue forever, but the estate is liable to be determined without the aid of a conveyance, by some act or event, circumscribing its continuance or extent.    It is the uncertainty of the event and the possibility that the fee may last forever, that renders the estate a fee, and not merely a freehold."

And the court concludes:

"This Indian title being a base, qualified, or determinable fee, with only the *possibility of a reversion*, and not the right of reversion, in the United States, all the estate is in the Cherokee Nation of Indians.

What was said in these cases, however, was said with reference to the estate of the Cherokee Nation in the permanent home lands, being the *seven million acres*, and the *eight hundred thousand acres*, and did not refer to the estate of the Cherokee Nation in the Cherokee Outlet. And it is noticeable, too, that no two of the cases agree as to the estate of the Cherokee Nation in their home lands. In the first case, it is called a fee simple; in the second, an estate in fee upon a condition subsequent; and in the third, a base, qualified, or determinable fee. But by striking out of the patent the condition, that the lands shall *revert* to the United States, if the Cherokee Nation shall abandon the same, all the cases can be reconciled, and give to the Cherokee Nation a fee simple estate.

How then, does the estate of the Cherokee Nation in the Cherokee Outlet differ, if at all, from their estate in the home lands? They are both held by one and the same title, that is, the several treaties and the patent of 1838; but that there is a difference, in contemplation of law, is manifest to the legal mind, from a consideration of the several treaties, in pursuance of which the patent was issued, and which are referred to in the patent.

As to the Cherokee Outlet, the several treaties provide :

"In addition to the *seven million of acres* of land, thus provided for and bounded, the United States further guarantee to the Cherokee Nation a *perpetual outlet* west, and a free and unmolested use of all the country west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their rights of soil extend."

What the United States have here guaranteed to the Cherokee Nation, is a *perpetual outlet* west, and that *perpetual outlet* is ceded by the treaties, and granted by

the patent of 1838. The estate of the Cherokee Nation in the Cherokee Outlet differs from their estate in the *home lands* in this, that there is no qualification of the use of the *home lands*, and they may be used for any purpose consistent with a fee simple ownership, while the estate in the Cherokee Outlet is qualified as to the use of the lands themselves, and the law annexes a condition that they shall be used for the purpose of an *outlet*, and for no other.

It is contended on behalf of the complainants, and alleged in their bill of complaint, that the Cherokee Nation is the owner of the Cherokee Outlet in fee simple; and, in behalf of the defendant, that their only interest is a mere *easement*, and that the fee of the lands is in the United States. It is clear, however, upon principle and authority, that neither one of these positions is tenable, and that the estate of the Cherokee Nation is a base, qualified, or determinable fee, and that, too, whether we reject, or retain, the condition in the patent, that the lands shall revert to the United States, if the Cherokee Nation shall abandon the same.

In Coke upon Littleton it is said :

"Of fee simple it is commonly holden that there be three kinds, viz : fee simple absolute, fee simple conditional, and fee simple qualified, or a base fee."

And Blackstone in defining a base, or qualified, fee, says :

" A base, or qualified, fee is such a one as hath a qualification subjoined thereto, and which must be determined whenever the qualification annexed to it is at an end." (2 Com. p. 109.)

In the case of the *United States v. Rogers*, 23 Fed. Rep. 663, the court had occasion to examine and pass upon the question under consideration, and there said :

" If this is an offence against the laws of the United States, it was committed in that part of the Cherokee country known as the 'Cherokee Outlet.' This coun-

try, together with the other part of its lands, was granted to the Cherokee Nation, as a nation, by the treaties between the Nation and the United States, made May 6, 1828; (Indian Treaties, 56 and 57); the fourteenth of February, 1833, (Id. 61,) and December 29, 1835, (Id. 65.) By these treaties the Cherokee Nation was granted a perpetual outlet west, and a free and unmolested use of all the country lying west of the western boundary line of the seven million acres of land granted in and by the same treaties. * * * * * * * * By looking at the title of the Cherokees to their lands, we find that they hold them all by substantially the same kind of title. * * * * * This court held in the case of the *United States v. Reese*, 5 Dillon 405, that the Cherokees hold their land by title different from the Indian title by occupancy; they derived it by grant from the United States. It is a base, qualified, or determinable fee, without the right of reversion, but only the possibility of reversion, in the United States. This in effect puts all the estate in the Cherokee Nation." (See, also, *in re Wolf*, 27 Fed. Rep, 615.)

The qualification annexed to a base, qualified, or determinable fee may be either one of two kinds. It may be a qualification which attaches itself to the use of the land, so that the estate is held to be granted for that *use* and *purpose* only, and on the cessation of the *use* the estate expires; or it may be one which is concerned with the happening of a more strictly collateral event, in that case leaving the use of the estate free for any purpose, but limiting its existence only by the event contemplated, or to the continuance of the state of affairs contemplated at the time of the grant,

In the case of the *State v. Brown*, 3 Dutch., (N. J.) 13, land was conveyed to the Morris Canal and Banking Company, for the purposes of a canal, and as long as used for a canal, and it was held that the estate conveyed was a base, qualified, or determinable fee, and liable to be defeated whenever they ceased to use the

land for the purpose specified in the grant ; and, in passing upon the question, the court said :

" By the deed to the canal company, the land is conveyed to them, their successors and assigns, together with all and singular the waters, profits, privileges, and advantages, with the appurtenances to the same belonging or in any wise appertaining , also, all the estate, rights, title, interest, claim and demand whatsoever of the party of the first part of, in, and to the same, and to every part and parcel thereof ; to have and to hold all and singular the above described tract or parcel of land and premises, with the appurtenances unto the said party of the second part, their successors and assigns, to the only proper use, benefit and behoof of the said party of the second part, their successors and assigns, *as long as used for a canal.* There is no reservation in the deed. It conveys all the right, title and interest of the grantors in the land and its appurtenances for the term specified fn the grant, to-wit: *As long as used for said canal.*

"By the terms of the conveyance, the grantees take a qualified fee liable to be defeated whenever they cease to use the land for the purpose specified in the grant. (1 Inst. 1, b 27 a; 1 Cruise 79 tit. 1, § 82; 2 Bl. Com. 110.")

In the case of *Sheetz v. Fitzwater,* 5 Penn. State, 126, which was an action of trespass, in which the title to the *locus in quo* was involved, the plaintiff claimed title under a deed, dated in 1746, from Emlen to Lardner, conveying "a certain mill dam or pond of water, and mill race or stream of water, issuing and proceeding from the said mill dam or pond of water, as the same is now situated, and being in and upon a certain tract or parcel of land situated in the manor of Springfield, together also with the site and soil of the said mill pond or dam, and race of water, and also one perch of land on each and every side of the said pond, or dam and race of water, to and for the use and service of a certain mill, with the land thereto belonging, and for no

other use whatsoever. The said perch of land to be taken and laid out from the center or middle of the said mill race, and from the edge of the water round or on the outside of the sand pond, if his, the said George Emlen's land shall extend one perch beyond the said dam or pond, or otherwise, so far as the said George Emlen's land doth extend beyond the said point, not exceeding one perch; *and also,* full and free liberty and privilege to and for the said Lynford Lardner, his heirs and assigns, of egress and regress to and from the said mill pond and race, to repair, support and main-tain the same for the use and service of the said mill. (The liberty and privilege of making bridges and hedges or fences across the said mill race, and of pass-ing and repassing over and along the same, to and from the adjacent land of the said George Emlen, so as such bridges, hedges or fences, do not obstruct, hinder, or prejudice the same race or pond of water, or either of them, excepted and hereby reserved to the said George Emlen, his heirs and assigns.)"

On the trial of the cause, the court instructed the jury, as to the estate conveyed by the deed from Emlen to Lardner, as follows:

"But Emlen did not convey a fee simple estate in that land. He conveyed a qualified fee, determinable on the abandonment by Lardner, his heirs or assigns, of the use and service for which the conveyance was made, as stated in his deed. And in conveying such limited fee, he retained the reversion in himself; and that he could permit to descend or to sell to others. To convey such limited fee, and to retain the reversion, was his intention, as the court collects it from his deed; and such intention of the grantor, when legal, is the governing principle when construing conveyances; (4 Dal. 347; 3 Watts & Serg. 303; 2 Binn, 537, 544.) Lardner therefore acquired an estate in this pond and mill race as land to be held by him, his heirs and as-signs, so long, and no longer, as he or they continued

to use them for the purpose stated; and necessarily they reverted to Emlen, or his heirs or assigns, as the case might be, whenever that purpose was abandoned, and the land was subjected to other uses."

The giving of these instructions by the trial court was assigned for error, but the court held, Gibson, C. J., delivering the opinion, that they stated correct propositions of law. And see also the following cases: *Board of Education v. The Inhabitants.* 18 Ohio St., 221; *Kirk v. King,* Pa. State, 436, *Improvement Co. v. Mayor,* 36 N. J. 550.

The estate of the Cherokee Nation in the Cherokee Outlet, under the several treaties, and the patent of 1838, was considered in the case of the *United States v. Soule,* 30 Fed Rep., 918, by that eminent jurist, Judge Brewer, now of the supreme court of the United States, and in which he said:

"Now, is this outlet, within the meaning of the Act of 1883, *set apart* and *occupied* by the Cherokee Nation? That it was set apart to that Nation is evident; but was it occupied? Doubtless, in a certain sense it was occupied, because the Cherokee Nation had a title and right to possess it; but, if congress had meant by this Act to include all land owned by the Cherokees, the words, *set apart,* would have been ample, and the word *occupied* was superfluous. Obviously, some distinctive matter was intended to be expressed by the use of the word. The significance of it is evident, from the language of the *proviso* in Art. 2, heretofore quoted. Manifestly congress set apart that 7,000,000 acres as a home, and that was thereafter to be regarded as *set apart* and *occupied,* because, as expressed in the preamble of the treaty, Congress was intent upon securing a permanent home. Beyond that, the guaranty was of an outlet, not territory for residence, but for passage ground, over which the Cherokees might pass to all the unoccupied domain west. But while the exclusive right to this outlet was guaranteed, while patent was issued conveying this outlet, it was described and intended obviously as an outlet, and not as a home. So,

whatever rights of property the Cherokees may have in this outlet, it was not territory set apart for a home, and is not territory, within the language of the Act of 1883, *set apart* and occupied by the Cherokee tribe."

· That the Cherokee Outlet was *ceded* and *granted* by the United States, and accepted by the Cherokee Nation, for the purpose of, and to be used as, an outlet only, and was so understood by both parties to the treaties and patent, is placed beyond all question from a consideration of the treaty of December 29, 1835, in which provision is made for the additional *eight hundred thousand acres* as a part of the permanent home, it being apprehended that the *seven million acres*, set apart for that purpose, were not sufficient for the united Cherokees. If the *six million acres* in the Cherokee Outlet could have been used for the purpose of a home, there would have been no necessity for the purchase of the additional lands, for which the Cherokee Nation paid the sum of $500,000.

Again, in dividing the Cherokee Nation into judicial districts, the laws of the nation do not recognize any territory west of the 96th meridian, and, consequently, cover no part of the Cherokee outlet, as it was not inhabited in the sense in which their home lands were inhabited. And it is significant, also, that, as early as 1821, in a letter written by Mr. Calhoun, then secretary of war, to the Cherokees, in Arkansas, they were promised a permanent home and an outlet west, but were distinctly informed that they should have no right of soil in the outlet, but an outlet only. It is true that the outlet there spoken of is not the outlet in controversy; but the transaction tends to show what the Cherokees understood by having guaranteed to them a *perpetual outlet* west.

In construing the several treaties, and the patent of 1838, as vesting in the Cherokee Nation a base, quali-

fied, or determinable fee in the Cherokee Outlet, no effect has been given to the condition in the patent that the land shall *revert* to the United States, if·the Cherokee Nation shall *abandon* the same; nor is it necessary to give it any effect for the purposes of this case.   As the lands were *ceded* and *granted as an outlet*, the law annexes the qualification, or condition, that they can be used for no other purpose, and that the estate shall continue no longer than the proper use of the lands continues.

That the law implies a qualification, or condition, in such case, is clear.   In the *Indianapolis, Peru & Chicago R. W. Co. v. Hood et al.*, 66 Indiana, 580, it was held:   "Where Real estate is coveyed to a railway company, for and in consideration of the permanent location and construction of the depot of said railroad thereon, and such depot is constructed upon said real estate, but is subsequently removed and erected upon other land, the removal constitutes a breach of the implied condition subsequent contained in such deed, and such real estate reverts to the grantor."

In this last case, it is called a condition subsequent. Now, the distinction between a base fee and an estate on condition subsequent is not recognized by authority, but is well founded in reason, resting on the broad distinction between a condition and a limitation, and is this:   In the case of an estate on condition subsequent, when it is once vested in the grantee, the estate can be destroyed only by a concurrence of two things, one of which is an active proceeding on the part of the grantor, there must be a breach of the condition and an entry to take advantage of the forfeiture, whereas, in the case of a base fee, the qualification, or the circumstance, upon whose existence or non-existence the estate depends, enters into the limitation itself, becomes an *integral part of the very estate;* and when

the state of affairs upon whose continuance the estate is conditioned and limited comes to an end, the estate itself *ipso facto* ceases. (Leading cases in American Law of Real Property, Vol. 2, 19–29.) .

And if it were held that the estate of the Cherokee Nation in the Cherokee outlet is an estate upon a con-- dition subsequent, that is, that it shall continue so long as it shall be used *as an outlet*, the same construction must follow as to the *use* of the land, and it could not lawfully be used for any other purpose than that of an *outlet*. Any other *use* would be a breach of the con- dition, for which the United States might enter and declare a forfeiture.

As the Cherokee Nation, then, could not lawfully, and of right, use any part of the Cherokee outlet for the purpose of quarrying, selling and shipping stone found therein, it could not by license authorize the complainants in this suit to operate the stone quarry, and to sell and ship the stone, in compliance with con- tracts such as are stated in the bill of complaint.

If the lands in the Cherokee outlet can lawfully be used for the purposes of a stone quarry, they may be used for farming and other purposes as well, and the Cherokees may settle upon and occupy them as freely as they do their home lands, and the distinction be- tween the *perpetual outlet west* and the *permanent home*, so scrupulously maintained in the several treaties, and in the patent of 1838, would be completely nullified. Such an event was not contemplated by the parties, when the treaties were concluded and the patent issued.

Nor are the rights of the Cherokee Nation in the use of the Cherokee outlet, enlarged by the treaty of 1866. That treaty provides:

"Article 16. The United States may settle friendly Indians in any part of the Cherokee country west of

96° to be taken in a compact form in quantity not exceeding 160 acres for each member of each of said tribes thus to be settled; the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes to be held in common or by their menbers in severalty, as the United States may decide.

"Said lands thus disposed of to be paid for to the Cherokee Nation at such price as may be agreed upon between the said parties in interest, subject to the approval of the president, and if they should not agree, then the price to be fixed by the president.

"The Cherokee Nation to retain the right of possession of and jurisdiction over all of said country west of 96° of longitude until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever as to each of said districts thus sold and occupied."

By operation of this treaty, the title of the Cherokee Nation to the lands in the Cherokee outlet is made subject to extinguishment in favor of friendly tribes of Indians to be settled there by the United States; and in consequence of such agreement, the Osages, and several other tribes, have acquired title to large tracts of land in the eastern end of the outlet, thus effectually destroying the *use* of the outlet *as an outlet* to the Cherokee Nation. But, as to the lands not sold, the Cherokee Nation still retains its possession and jurisdiction, being the same possession and jurisdiction which it had under the prior treaties, and the patent of 1838.

And the provision of this treaty, that the United States may settle friendly tribes of Indians in any part of the Cherokee Outlet, clearly showing that, at the time the treaty was made, the Cherokee Nation did not claim the right, under the prior treaties, and the patent of 1838, to settle upon and occupy the outlet as a home or that they had any other *use* in it than that of an *outlet*.

As said by Judge Brewer ; in *United States v. Soule*, *supra*, what was guaranteed to the Cherokee Nation was an *outlet*, "not territory for residence, but for passage ground, over which the Cherokees might pass to all the unoccupied domain west." To give them the right to settle upon and cultivate the outlet, and to operate stone quarries and remove and sell mineral, is an unwarranted extension of the guaranty, which cannot be upheld.

And if the Cherokee Nation has ceased to use the outlet, *as an outlet*, the *cesser* of the use has terminated their estate, and the lands have *reverted* to the United States. But whether there has been a *cesser* of the use is rather a political than a judicial question, which should be settled by congress and the chief executive of the nation. And if the lands have been abandoned *as an outlet*, and subjected to other uses by the Cherokee Nation, or with their consent and by their authority, their estate has terminated and they have reverted to the United States.

It follows, from the conclusion reached as to the rights of the Cherokee Nation in the Cherokee Outlet, that the complainants, who claim under a license from the Cherokee Nation, have no right to operate the stone quarry in question, and that their acts in doing so are wrongful ; and a court of equity will not lend its aid to protect them in a wrongful act ; and, in view of the conclusion reached upon the principal question involved, it is unnecessary to consider the other questions argued. The application for a temporary injunction will be denied, and the restraining order dissolved.

*Injunction denied.*